IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LYNN R., as guardian of T.R., a minor,<br><br>Plaintiff,<br><br>v.<br><br>VALUEOPTIONS, AT&T (f/k/a SBC Communications Inc.), and SBC UMBRELLA BENEFIT PLAN NO. 1 – SNET ACTIVE BARGAINING UNIT EMPLOYEE HEALTH PLAN,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br><br><br>Case No. 2:12-CV-1201 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on cross-Motions for Summary Judgment.[1]  Plaintiff

brings this action under the Employee Retirement Income Security Act ("ERISA").[2]  Plaintiff

challenges Defendants' denial of coverage for residential mental-health care that Plaintiff's

dependent received from July 9, 2010, to March 9, 2011.  Also before the Court is Plaintiff's

Motion to Strike Exhibit A-3 of the Declaration of Scott Bender.[3]  For the reasons discussed

more fully below, the Court will deny Plaintiff's Motion to Strike, grant in part and deny in part

Plaintiff's Motion for Summary Judgment, and deny Defendants' Motions for Summary

Judgment.

---

[1] Docket Nos. 42, 44, 45.

[2] 29 U.S.C. §§ 1001–1461 (2012).

[3] Docket No. 53.

## I.  BACKGROUND

During the time period relevant to this action, Plaintiff's minor dependent, T.R., was insured under the SBC Umbrella Benefit Plan No. 1 (the "Plan"), a self-funded group health benefit plan sponsored by T.R.'s father's employer, and subject to ERISA.

A.     THE PLAN

The Terms of the Plan are summarized in a Summary Plan Description booklet ("SPD").[4] The SPD explains that it "may contain generalizations and informal terms rather than precise legal terms."[5]

Administration of the Plan is structured as follows:

**Plan Administrator**
The Plan Administrator is the named fiduciary of the Plan and has the power and duty to do all things necessary to carry out the terms of the Plan.  The Plan Administrator has the sole and absolute discretion to interpret the provisions of the Plan, to make findings of fact, to determine the rights and status of participants and others under the Plan, to decide disputes under the Plan, and to delegate all or a part of this discretion to third parties.  To the extent permitted by law, such interpretations, findings, determinations and decisions shall be final and conclusive on all persons and for all purposes of the Plan.

**Administration**
The Plan Administrator has contracted with third parties for certain functions, including, but not limited to, the processing of benefits and Claims related thereto. In carrying out these functions, these third-party administrators have been delegated responsibility and discretion for interpreting the provisions of the Plan, making findings of fact, determining the rights and status of participants and others under the Plan, and deciding disputes under the Plan.[6]

---

[4] Docket No. 47-1 to 47-5.

[5] Docket No. 47-1, at 2.

[6] Docket No. 47-4, at 23.

SBC Communications, Inc. is the Plan Sponsor and Plan Administrator, while Southern New England Telephone Company ("SNET") is the Plan Sponsor and Plan Administrator of components of the Plan. The Plan "provide[s] coverage for mental health/chemical dependency (MH/CD) treatment through the MH/CD Claims Administrator."[7] "The MH/CD Claims Administrator has full discretionary authority to interpret the provisions of the applicable Non-HMO Option and to determine entitlement to MH/CD benefits."[8] SNET "administers Claims and appeals for mental health/chemical dependency (MH/CD) benefits . . . on a contract basis with: *ValueOptions* . . . ."[9]

The Plan provides, "When you call the MH/CD Claims Administrator, a wide range of resources will become available to you and your covered dependents, including referrals to: psychiatrists, psychologists, psychiatric Social Workers, masters level nurses, hospitals, clinics and chemical dependency programs."[10]

One such mental-health service available under the Plan is access to residential treatment centers.[11] A residential treatment center is defined by the Plan as "a level of care that requires 24-hour on-site supervision as well as an array of therapeutic activities and education (as

---

[7] Docket No. 47-2, at 39 (describing coverage under the Plan's SNET Point-of-Service component); *see also* Docket No. 47-3, at 24 (describing coverage under the Plan's Preferred Provider Organization component); Docket No. 47-4, at 4 (describing coverage under the Plan's SNET Medical Plan for Retirees component).

[8] Docket No. 47-4, at 28.

[9] *Id.* at 26.

[10] Docket No. 47-2, at 39; Docket No. 47-3, at 24; Docket No. 47-4, at 4.

[11] *See* Docket No. 47-2, at 40; Docket No. 47-3, at 25; Docket No. 47-4, at 7.

appropriate). While less restrictive than acute inpatient care, residential treatment does have structure and rules that residents must follow to maintain their placement."[12]

The SPD does not provide additional criteria to guide the determination of whether a facility qualifies as a residential treatment center under the Plan. Specifically, the SPD does not provide a more detailed description of the "24-hour on-site supervision" required for qualifying residential treatment centers.

Before accessing mental-health services provided by a residential treatment center, individuals seeking coverage under the Plan must obtain precertification.[13] Coverage is not provided for mental-health services at a residential treatment center without precertification.[14]

B.    DENIAL OF COVERAGE

In July 2010, Plaintiff sought mental-health treatment for T.R. at Aspen Ranch School, in Loa, Utah. On July 2, 2010, Aspen Ranch School contacted ValueOptions concerning inpatient mental-health benefits. According to ValueOptions's internal call logs, Aspen Ranch School was notified of the scope of relevant coverage, including the requirement for precertification.[15] Plaintiff's dependent began attending Aspen Ranch School on July 9, 2010.[16] T.R. continued to attend the facility until March 9, 2011.[17]

---

[12] Docket No. 47-4, at 21.

[13] Docket No. 47-2, at 40; Docket No. 47-3, at 25; Docket No. 47-4, at 7.

[14] Docket No. 47-2, at 40; Docket No. 47-3, at 25; Docket No. 47-4, at 7–8.

[15] Docket No. 47-7, at 41.

[16] Docket No. 47-6, at 5; Docket No. 47-7, at 5; Docket No. 47-8, at 26.

[17] Docket No. 47-7, at 10.

On July 20, 2010, Aspen Ranch School received notification from ValueOptions that T.R.'s treatment had not been certified.[18]  The notification letter states,

> "This letter is to inform you that no certification or no additional certification was given for the above referenced patient because:
> ValueOptions, please contact us via the toll-free access number indicated above."[19]

No cogent reason was provided for the initial denial.

Plaintiff submitted her first appeal to ValueOptions on September 21, 2010.[20]  In the appeal letter, Plaintiff acknowledged that after receiving the initial denial letter she had spoken with a ValueOptions representative who explained that "services were denied because the facility did not qualify for coverage."[21]  Plaintiff based her appeal on the SPD's definition of residential treatment centers and argued that Aspen Ranch School met the definition, based on the services provided by the school and on the school's status as a licensed residential treatment center in the State of Utah.[22]

On December 14, 2010, ValueOptions denied the first appeal.[23]  The denial letter explained, "Residential treatment is administratively denied because Aspen Ranch does not fulfill ValueOptions' credentialing criteria for residential treatment because Aspen Ranch does

---

[18] Docket No. 44-10, at 2–3; Docket No. 47-6, at 7–8.

[19] Docket No. 44-10, at 2; Docket No. 47-6, at 7.

[20] Docket No. 47-6, at 5; Docket No. 47-7, at 5.

[21] Docket No. 47-6, at 5; Docket No. 47-7, at 5.

[22] Docket No. 47-6, at 5–6; Docket No. 47-7, at 5–6.

[23] Docket No. 47-6, at 20.

not provide a 24-hour, on-site, nursing staff."[24]  ValueOptions further stated that the "decision is based on the Summary Plan Description for the benefit plan."[25]

On March 21, 2011, Plaintiff submitted her second appeal to ValueOptions.[26]  Plaintiff's second appeal again argued that ValueOptions's decision to deny coverage was not supported by the SPD.  Specifically, Plaintiff argued that the SPD only required that residential treatment centers provide 24-hour on-site supervision, and that the SPD provided no support for ValueOptions's determination that 24-hour on-site nursing staff is required.[27]  Plaintiff also noted that ValueOptions neither identified a specific provision upon which the denials were based nor provided other documentation supporting ValueOptions's conclusion that the phrase "24-hour on-site supervision" in the SPD actually requires "24-hour, on-site, nursing staff."[28]

ValueOptions denied the second appeal on May 2, 2011.[29]  The denial letter stated, "It was verified through the facility that their overnight staff is not clinically licensed which is a requirement for residential treatment services."[30]  The denial was "based on the Summary Plan Description for the benefit plan."[31]

---

[24] *Id.*

[25] *Id.*

[26] *Id.* at 27.

[27] *Id.* at 27–28.

[28] *Id.* at 27.

[29] Docket No. 47-7, at 10.

[30] *Id.*

[31] *Id.*

## II. DISCUSSION

### A.  MOTION TO STRIKE

Before turning to the merits of Plaintiff's ERISA claim, the Court must first consider

Plaintiff's Motion to Strike.  Plaintiff seeks to strike Exhibit A-3 to Scott Bender's Declaration,

which was submitted and relied upon by Defendants in their Motions for Summary Judgment.

The exhibit is ValueOptions's Credentialing Criteria for Facility / Organizational Providers.

Defendants submitted this document to provide support for ValueOptions's determination that

residential treatment centers must provide twenty-four hour on-site nursing staff in order to

qualify for coverage under the Plan.

The Court's review of ValueOptions's denial of benefits is "'limited to the administrative

record—the materials compiled by the administrator in the course of making his decision.'"[32]

"'[T]he district court should only look at the evidence that was before the plan administrator or

trustee at the time of the determination.'"[33]  And while plan administrators "must identify the

specific reasons for denying benefits," they "may not be required to give 'the reasoning behind

the reasons.'"[34]

Defendants effectively assert that Exhibit A-3 is the reasoning behind its reason for

denial.  In response to Plaintiff's first appeal, ValueOptions referenced the criteria contained in

---

[32] *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (quoting *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009)).

[33] *Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1203 (10th Cir. 2002) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993)).

[34] *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1192 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

this exhibit when it explained that benefits were denied "because Aspen Ranch does not fulfill ValueOptions' credentialing criteria for residential treatment."[35]  Moreover, ValueOptions's internal call logs contain language consistent with the criteria listed in Exhibit A-3.  The Court is persuaded that ValueOptions relied on Exhibit A-3 when denying benefits in this case, and that the Court may therefore consider the document now.  Based on the foregoing, the Court will deny Plaintiff's Motion to Strike.

B.     CROSS-MOTIONS FOR SUMMARY JUDGMENT

As explained at the hearing and discussed more fully below, the Court finds that the appropriate standard of review in this case is the arbitrary-and-capricious standard.  Moreover, the Court finds that ValueOptions's denial of benefits was arbitrary and capricious.

1.     *Standard of Review*

The parties disagree as to the standard of review to be applied here.  Defendants argue that the Court should employ the arbitrary-and-capricious standard, while Plaintiff argues for de novo review.

A denial of benefits under an ERISA plan "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[36]  If, however, "the plan gives an administrator discretionary authority to determine eligibility for benefits or to construe its terms, [courts] employ a deferential standard of review, asking only whether the denial of benefits was

---

[35] Docket No. 47-6, at 20.

[36] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

arbitrary and capricious."[37]  As set forth above, the Plan granted ValueOptions discretionary authority to determine eligibility for benefits or to construe the terms of the Plan.  Therefore, ordinarily an arbitrary and capricious standard would apply.

Plaintiff argues, however, that ValueOptions's denial of benefits should be reviewed de novo because of alleged procedural irregularities, breaches of fiduciary duty, and conflicts of interest.  The Court will discuss each of these in turn.

a.    Procedural Irregularities

The Tenth Circuit has held that "when a serious procedural irregularity exists, and the plan administrator has denied coverage, an additional reduction in deference is appropriate."[38]  However, the Tenth Circuit has noted that a serious procedural irregularity is not "present in every instance where the plan administrator's conclusion is contrary to the result desired by the claimant."[39]  The irregularity must raise "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim."[40]

Plaintiff identifies a number of alleged procedural irregularities in violation of regulations governing ERISA-claims procedures and argues that the violations warrant de novo review.  In support of this position, Plaintiff directs the Court to a line of cases applying the de-novo

---

[37] *Holcomb*, 578 F.3d at 1192 (citation and internal quotation marks omitted).

[38] *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1006 (10th Cir. 2004), *abrogated on other grounds by Glenn*, 554 U.S. at 117.

[39] *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1214 n.2 (10th Cir. 2006); *see also Grosvenor v. Qwest Commc'ns Int'l*, 191 F. App'x 658, 662 (10th Cir. 2006) (unpublished decision) ("A serious procedural irregularity is not present every time a plan administrator comes to a decision adverse to the claimant on conflicting evidence.").

[40] *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000).

standard where a claim for benefits is deemed denied because the plan administrator failed to render a decision within the time limits mandated by ERISA.[41]  In the past, the Tenth Circuit has employed a substantial-compliance rule, whereby de novo review is only triggered for procedural irregularities that are consequential and that are not made in the context of an on-going, good-faith dialogue between the administrator and the claimant—such as claims that are deemed denied.[42]  Plaintiff contends that the substantial-compliance rule is no longer valid because it was based upon regulations that have since been amended in a way that is inconsistent with the substantial-compliance rule.

The Tenth Circuit has acknowledged this issue, but has not yet resolved it.[43]  This Court need not resolve the issue at this time either.  Even if the Court overlooks all of the procedural irregularities and affords ValueOptions's determination maximal deference, the Court finds—as discussed more fully below—that ValueOptions's denial was arbitrary and capricious.

Moreover, even if the Court assumes that the substantial-compliance rule does not apply, the plain text of ERISA does not direct the Court to apply de novo review based on procedural irregularities.  The appropriate remedy is described in 29 C.F.R. § 2560.503-1, as follows:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

---

[41] *See, e.g., Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 827 (10th Cir. 2008); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003).

[42] *See Kellogg*, 549 F.3d at 827.

[43] *Id.* at 828.

Section 502(a) of ERISA provides participants and beneficiaries a right to bring civil actions to enforce their rights under ERISA.[44]  As such, even if the Court were to agree that Defendants violated ERISA's claims procedures, the consequence is to deem Plaintiff's administrative remedies exhausted and permit Plaintiff to bring this cause of action.  Without guidance from the Tenth Circuit, this Court is not prepared to hold that procedural irregularities trigger de novo review.

       b.       Breaches of Fiduciary Duty

Plaintiff argues that ValueOptions ignored or did not address Plaintiff's arguments in the claims appeal process and that ValueOptions's conduct belies an adversarial stance that violates the fiduciary duty owed by a plan administrator to a plan participant or beneficiary.  This adversarial stance, Plaintiff argues, is indicative of a conflict of interest that warrants de novo review.  Plaintiff has not, however, presented facts to support this argument.

While the Court acknowledges that ValueOptions's denial letters are not comprehensive, they are not so disconnected from Plaintiff's appeal requests to demonstrate a breach of ValueOptions's fiduciary duty.  Plaintiff presented ValueOptions with arguments concerning the definition of residential treatment centers under the SPD.  ValueOptions's denial letters explained its own interpretation of the definition.  Upon review of the record, the Court is not persuaded that ValueOptions's denials were motivated by an adversarial stance, such that the Court must consider whether a breach of a fiduciary duty occurred.

---

[44] *See* 29 U.S.C. § 1132(a).

c.    Conflict of Interest

Plaintiff argues that the deference granted to ValueOptions's determination should be reduced because ValueOptions operates under a conflict of interest.  Specifically, Plaintiff contends—without providing any factual support—that ValueOptions acts as an agent of the Plan's sponsor, who has a financial incentive to deny claims because the Plan is self-funded.

A conflict of interest exists where "a plan administrator both evaluates claims for benefits and pays benefits claims."[45]  This conflict can exist even when a third-party evaluates claims, such as when "the plan administrator is not the employer itself but rather a professional insurance company."[46]  "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion."[47]

The Tenth Circuit has "crafted a sliding scale approach where the reviewing court will always apply an arbitrary and capricious standard, but will decrease the level of deference given in proportion to the seriousness of the conflict."[48]  Consequently, a conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing

---

[45] *Glenn*, 554 U.S. at 112.

[46] *Id.* at 114.

[47] *Firestone*, 489 U.S. at 115.

[48] *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations, internal quotation marks, and alterations omitted).

point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."[49]

The SPD explains, "Medical benefits under the medical program are paid by SBC Participating Companies directly or through funds made available for this purpose through [certain trusts]. The Claims Administrators do not insure benefits provided under the Plan."[50] Moreover, "Plan administration is retained by the Plan Administrator. However, the Plan Administrator has contracted with third parties for certain functions . . . . The [Plan Administrator] administers Claims and appeals for mental health/chemical dependency (MH/CD) benefits . . . on a contract basis with: *ValueOptions* . . . ."[51]

The Plan splits the Plan Administrator and Claims Administrator roles between SBC and ValueOptions. This is a fundamental difference between the situations that have given rise to the Tenth Circuit's implementation of a sliding-scale standard of review and the instant case. The Court is unable to conclude that the Plan's structure creates an inherent conflict of interest. Moreover, Plaintiff has not presented evidence indicating that a conflict of interest otherwise exists.

Based on the foregoing, the Court concludes that ValueOptions's denial of benefits should be reviewed under the arbitrary-and-capricious standard.

---

[49] *Firestone*, 489 U.S. at 117.

[50] Docket No. 47-4, at 28.

[51] *Id.* at 25–26.

*2.     Denial of Benefits*

With the appropriate standard of review in mind, the Court turns to the issue of whether ValueOptions's denial of benefits was arbitrary and capricious. "'Under the arbitrary-and-capricious standard, our review is limited to determining whether the interpretation of the plan was reasonable and made in good faith.'"[52]

> In applying the arbitrary and capricious standard, the decision will be upheld so long as it is predicated on a reasoned basis. In fact, there is no requirement that the basis relied upon be the only logical one or even the superlative one. Accordingly, [the Court's] review inquiries whether the administrator's decision resides somewhere on a continuum of reasonableness— even if on the low end.
> A lack of substantial evidence often indicates an arbitrary and capricious decision. Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion. Substantial evidence means more than a scintilla, of course, yet less than a preponderance. The substantiality of the evidence is evaluated against the backdrop of the administrative record as a whole.[53]

The Tenth Circuit has recognized four questions that help guide this inquiry: "(1) Is the interpretation the result of a reasoned and principled process? (2) Is it consistent with any prior interpretations by the plan administrator? (3) Is it reasonable in light of any external standards? And (4) is it consistent with the purposes of the plan?"[54]

The second and fourth questions are not helpful to the Court's analysis here. The administrative record does not address ValueOptions's prior interpretations of the SPD's

---

[52] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment Life Ins. Plan*, 605 F.3d 789, 795 (10th Cir. 2010)).

[53] *Adamson*, 455 F.3d at 1212 (citations and internal quotation marks omitted).

[54] *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 929 (10th Cir. 2006) (citations omitted).

definition of residential treatment centers. Similarly, the record does not provide adequate information about the purposes of the Plan as it relates to residential treatment centers. As such, the Court will not take these questions into account.

The first and third questions are interrelated. ValueOptions denied benefits three times: once in the initial denial, and twice when denying Plaintiff's appeals. The initial denial letter contained no explanation for the denial, but Plaintiff acknowledged that she was informed by telephone that the denial was based on Aspen Ranch School's failure to qualify for coverage. ValueOptions's denial of Plaintiff's first appeal explained that Aspen Ranch School did not qualify for coverage because it did not provide on-site twenty-four hour nursing staff. In the third denial, ValueOptions denied coverage because the school did not have licensed staff on-site twenty-four hours a day. The SPD provides coverage for residential treatment centers and explains that such facilities must provide twenty-four hour on-site supervision. In other words, ValueOptions interprets the term "supervision" to mean either "nursing staff" or "licensed staff."

ValueOptions's denials did not provide indications of the underlying reasons and principles driving its interpretation of the SPD. Rather, ValueOptions simply stated that Aspen Ranch School failed to meet the criteria dictated by ValueOptions's interpretation of the term "supervision." After careful review of the record, the Court is unable to find indications that ValueOptions's interpretation was the result of a reasoned and principled process. Exhibit A-3 is the only possible support for ValueOptions's interpretation. And Exhibit A-3 supports Plaintiff's position more than it supports Defendants' position.

Exhibit A-3 does not provide reliable clarification of the SPD's requirement for twenty-four hour on-site supervision at residential treatment centers. The Plan covers both in-network

and out-of-network residential treatment centers.[55]  But Exhibit A-3 explains that it only

provides the "minimum . . . credentialing criteria for network participation."[56]  At oral argument,

ValueOptions explained that it is partially correct that the document provides the requirements

that a provider must satisfy in order to be an in-network provider with ValueOptions.

ValueOptions asserted that the document also provides minimum quality standards for any

provider covered by the Plan.  Under ValueOptions's explanation of Exhibit A-3, all residential

treatment centers covered by the Plan would be required to satisfy the same credentialing criteria

that qualifies providers to be in-network providers with ValueOptions.  If this is the case, Exhibit

A-3 effectively restricts the Plan's coverage to disallow any out-of-network residential treatment

centers.  As the SPD specifically provides coverage for both in-network and out-of-network

providers, Exhibit A-3 cannot be read in such a way.  Rather, the Court understands Exhibit A-3

to provide requirements that a provider must meet in order to participate in ValueOptions's

network, as the exhibit itself says.

　　　　As such, although the exhibit provides helpful guidance about the criteria for the subset

of residential treatment centers that may be designated as in-network providers with

ValueOptions, it does not define the criteria for the residential treatment centers that are outside

of ValueOptions's network of providers, such as Aspen Ranch School.  Exhibit A-3 is therefore

inapplicable to Aspen Ranch School, and ValueOptions's reliance on the document in support of

its denial of benefits was arbitrary and capricious.

---

[55] *See* Docket No. 47-3, at 26–27; Docket No. 47-4, at 5–6.

[56] Docket No. 47-9, at 1.

The Court is also unable to conclude that ValueOptions's narrow interpretation is reasonable based on external standards. The Oxford English Dictionary defines "supervision" as "[t]he act or function of supervising. 1. a. General management, direction, or control; oversight, superintendence."[57] While supervision involves some degree of authority, the term does not necessarily connote formal qualifications held by the person who supervises. The common meaning of the word does not reflect the narrow limits asserted by ValueOptions. Plaintiff's interpretation, on the other hand, comports with the common meaning.

The parties direct the Court's attention to Utah's Administrative Code, which includes regulations governing residential treatment centers. The SPD does not limit coverage to Utah, incorporate Utah's regulatory regime, or reference Utah's licensing requirements. Nonetheless, the parties argue that Utah's regulations clarify the proper meaning of the term "supervision," as it is used in the SPD's description of residential treatment centers.

The regulations require "a staff person trained, by a certified instructor, in standard first aid and CPR on duty with the consumers at all times."[58] Facilities are required to have "[a] minimum of two staff on duty and, a staff ratio of no less than one staff to every four consumers shall exist at all times, except nighttime hours when staff may be reduced."[59] And "if unlicensed staff are used, they shall be supervised by a licensed clinical professional."[60]

---

[57] 17 Oxford English Dictionary 245 (2d ed. 1998).

[58] Utah Admin. Code. R501-19-5(B).

[59] *Id.* R501-19-5(D)(3)(f).

[60] *Id.* R501-19-5(D)(1)(e).

Plaintiff argues that Aspen Ranch School's license with the State of Utah demonstrates that the facility satisfies the SPD's requirement for twenty-four hour on-site supervision. The regulations require a minimum of two staff members to be on-duty at all times, including at least one who is trained in first aid and CPR. Moreover, an additional layer of supervision exists for any unlicensed staff members who must be supervised by a licensed clinical professional. Because the facility is required to have trained staff members on duty at all times, Plaintiff contends that Aspen Ranch School satisfies the SPD's requirement for supervision.

ValueOptions argues, however, that the regulations only require supervision if staff members are unlicensed and that supervision must be performed by a licensed clinical professional. ValueOptions asserts that the regulations therefore support their position that supervision is linked with professional licensing.

To the limited extent that Utah's regulations shed light on the possibility that the term "supervision" has a specialized meaning as it is used in the SPD, the regulations do not support the meaning advanced by ValueOptions. In fact, in the one instance where the regulations use a variant of the word, the provision indicates that the task of supervision must be performed by a licensed clinical professional. If, as ValueOptions argues, the term "supervision" is properly understood as a task that must be performed by licensed clinical professionals, then the regulation would not need to duplicate that limitation so explicitly. Instead, the regulations use the term in a manner consistent with Plaintiff's position and the common meaning discussed above.

Upholding the denial of benefits in this case requires more than interpreting an ambiguous term, it requires substituting one requirement for another without any basis for doing

so. ValueOptions's determination rests entirely on the flexibility of the term "supervision." And that term cannot bear the interpretation that ValueOptions assigns to it. Even under the highly deferential arbitrary-and-capricious standard, denials are upheld so long as the record provides more than a scintilla of evidence in favor of the decision. The record before this Court provides no support for ValueOptions's interpretation of the term "supervision."

Defendants also argue that denial of coverage was appropriate because Plaintiff failed to obtain precertification of the treatment, as required under the Plan. But when "reviewing [a] decision to deny benefits, [courts] are limited to considering only the rationale given by [the claims administrator] for that denial."[61] ValueOptions did not articulate a precertification rationale for denying coverage at any point prior to this suit. The Court acknowledges that ValueOptions's initial denial letter informed Plaintiff that coverage was not precertified, but the letter was devoid of any substantive explanation for why precertification was denied. Defendants' position requires the Court to interpret the initial denial as providing a tautological rationale: coverage was not precertified because it had not been precertified. Additionally, all subsequent explanations of the denial focused exclusively on ValueOptions's interpretation of the term "supervision," and not on precertification. Consequently, precertification is not an appropriate basis for the Court's review.

Based on the foregoing, the Court finds that ValueOptions's denial was arbitrary and capricious and summary judgment in Plaintiff's favor is therefore appropriate.

---

[61] *LaAsmar*, 605 F.3d at 801.

3.      *Prejudgment Interest, Attorneys' Fees, and Costs*

Plaintiff requests prejudgment interest, attorneys' fees, and costs should she prevail.  As discussed above, Plaintiff prevails on her ERISA claim.

a.      Prejudgment Interest

"Under ERISA, '[p]rejudgment interest is . . . available in the court's discretion.'"[62] "Calculation of the rate for prejudgment interest also 'rests firmly within the sound discretion of the trial court.'"[63] "Courts commonly look to state statutory prejudgment interest provisions as guidelines for a reasonable rate."[64]

Utah law provides that "[u]nless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum."[65]

In this case, Plaintiff argues that she "has suffered significant financial hardship in being required to pay out of pocket for the treatment . . . ."[66] This is undoubtedly true.  Based on this hardship, the Court finds that it is reasonable to award prejudgment interest in this case.  The Court further finds that the rate established under Utah law is reasonable under these circumstances.

---

[62] *Weber*, 541 F.3d at 1016 (quoting *Benesowitz v. Metro. Life Ins. Co.*, 514 F.3d 174, 176 (2d Cir. 2007)).

[63] *Id.* (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1287 (10th Cir. 2002)).

[64] *Id.*

[65] Utah Code Ann. § 15-1-1(2) (West 2010).

[66] Docket No. 44, at 23.

b.    Attorneys' Fees and Costs

Pursuant to 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable

attorney's fee and costs of action to either party."  "A court may award fees and costs under 29

U.S.C. § 1132(g)(1) as long as the fee claimant has achieved some degree of success on the

merits."[67]

> The Tenth Circuit
>
> has established five factors a court may consider in deciding whether to exercise
> its discretion to award attorney's fees and costs: (1) the degree of the opposing
> party's culpability or bad faith; (2) the opposing party's ability to satisfy an award
> of fees; (3) whether an award of fees would deter others from acting under similar
> circumstances; (4) whether the party requesting fees sought to benefit all
> participants and beneficiaries of an ERISA plan or to resolve a significant legal
> question regarding ERISA; and (5) the relative merits of the parties' positions.
> No single factor is dispositive and a court need not consider every factor in every
> case.[68]

Considering these factors, the Court finds that an award of attorneys' fees and costs in

this case is not appropriate.  As to the first factor, the Court is not persuaded that ValueOptions's

interpretation of the SPD was made in bad faith even though the prelitigation record provided no

support for ValueOptions's denial of benefits.  ValueOptions's position is not supported by the

record, but it has some interpretive salience that weighs against finding bad faith.

On the second factor, it is clear that Defendants have the ability to satisfy an award of

fees.

---

[67] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013)
(citation and internal quotation marks omitted).

[68] *Id.* (citations omitted).

Third, an award of fees would work to deter Defendants and others from acting in a similar manner and would encourage claims administrators to operate in the manner envisioned by ERISA and its regulations.

Concerning the fourth factor, Plaintiff's request for fees does not appear to be motivated by an intention to benefit all beneficiaries or participants of the Plan, and Plaintiff's claim does not raise a significant question regarding ERISA.

Finally, although the Court concludes that ValueOptions's denial does not survive the highly deferential arbitrary-and-capricious standard, the parties' positions in this case were not unreasonably disproportionate. Consequently, the Court finds that the factors do not favor awarding attorneys' fees or costs in this case.

## III. CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Plaintiff's Motion to Strike (Docket No. 53) is DENIED. It is further

ORDERED that Defendant ValueOptions, Inc.'s Motion for Summary Judgment (Docket No. 42) is DENIED. It is further

ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 44) is GRANTED IN PART AND DENIED IN PART. It is further

ORDERED that Defendant AT&T and SBC Umbrella Benefit Plan No. 1 – SNET Active Bargaining Unit Employee Health Plan's Motion for Summary Judgment (Docket No. 45) is DENIED.

Within fourteen (14) days of this Order, Plaintiff's counsel is directed to supply the Court with clarification of the amount owed to Aspen Ranch School. Plaintiff's Complaint states that

the total unpaid cost of treatment at Aspen Ranch School is $107,200, but the Provider Summary Voucher submitted in connection with the cross-Motions for Summary Judgment indicates that the balance due for treatment up to February 28, 2011, was $76,375.  Within fourteen (14) days of this Order, Plaintiff's counsel is also directed to supply the Court with a calculation of prejudgment interest, at 10% per annum, in accordance with Utah Code Ann. § 15-1-1(2). Defendants will have an additional seven (7) days to file objections, if any, to Plaintiff's calculations of the amount due and prejudgment interest.

DATED this 26th day of August, 2014.

BY THE COURT:

TED STEWART
United States District Judge